IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| CEATS, INC. | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CASE NO. 6:10cv120 |
| | § | PATENT CASE |
| CONTINENTAL AIRLINES, ET AL. | § | |
| | § | |
| Defendants | § | |

## MEMORANDUM OPINION AND ORDER

This opinion construes the disputed terms in U.S. Patent Nos. 7,454,361; 7,548,866; 7,548,869; 7,548,870; 7,660,728; 7,660,729; and 7,664,663. Additionally, Defendants moved for summary judgment that several claim terms are indefinite (Docket No. 602). Having considered the parties' written and oral arguments, the Court **DENIES** the motion.

## BACKGROUND

CEATS asserts seven patents in this case: U.S. Patent Nos. 7,454,361; 7,548,866; 7,548,869; 7,548,870; 7,660,728; 7,660,729; and 7,664,663. The patents are all continuations flowing from the '361 patent, though some of the specifications are slightly different. Generally, the patents all relate "to an electronic means by which people can select the exact seat or seats they want" for events, venues, or on airplanes over the internet. *See* '361 patent, Abstract, 2:37–49. Data is transmitted to a remote user's computer allowing the computer to display an interactive seating map of the venue, event, or airplane. The user can then "mouse over" a seat causing additional information about that seat to be displayed. The user can select seats and purchase his selected seats.

1

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive;

2

it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid

3

a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

A claim is invalid under 35 U.S.C. § 112 ¶ 2 if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. The party seeking to invalidate a claim under 35 U.S.C. § 112 ¶ 2 as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

## DISPUTED TERMS[1]

As several terms raise similar or overlapping issues, the Court will address these issues first. Defendants argue that the patents only disclose mousing over individual seats or selecting individual seats to be added to the list of selected seats. Thus, Defendants contend that any claim or term that recites a set of seats, a portion of the interactive seat map, or multiple seats should be construed as relating to individual seats. CEATS contends the specifications are not so narrowly written and the claims should not be limited as Defendants argue.

---

[1] At the hearing, the parties announced that they had reached an agreement that no construction is necessary for the following terms: "accepting over the wide area network from the end user a payment for a seat"/ "accept over the wide area network from the end user a payment for the seat"/ "accept over the wide area network from the end user payment information for the one or more selected seats" ('361 patent, claim 1; '866 patent, claims 1 and 8; '870 patent, claims 1 and 3); "end user" ('869 patent, claims 1, 5); and "list of selected seats" ('361 patent, claim 1; '866 patent, claims 1, 8). The parties had previously agreed that "dedicated resident ticket vending software" ('361 patent, claim 1) means "software designed for ticket vending that remains installed on a computer" and "venue" ('361 patent, claim 1; '866 patent, claims 1, 2, 3, 4, 8; '869 patent, claims 1, 2, 3, 5) does not require construction.

Defendants argue that during prosecution the patentees distinguished the Huegel patent, which described choosing an "area" rather than individual seats. However, Huegel described a system where the user selected a preferred seating area and the system then selected the best available seats in that preferred area. The user was then able to purchase those best available seats. During prosecution of the '361 patent claims, which do not raise this multiple seat issue, the patentees distinguished Huegel because the '361 patent claimed selecting specific seat(s). Huegel is very different from the current patents, which claim or reference selecting multiple seats. Moreover, Defendants did not argue that Huegel was referenced during the later patents' prosecution. Rather, Defendants are attempting to use statements by the patentees made in response to a different issue to limit the later claims. Huegel does not support Defendants' proposed limitations.

Further, the patents themselves do not warrant Defendants' narrow construction. Figure 5, which discloses a sample software code to implement a preferred embodiment of the invention, defines the "Area" that can be selected. One skilled in the art would recognize that this "Area" could be programmed to be an individual seat or a grouping of seats. Moreover, the '361 patent, from which the other patents are continuations, repeatedly describes that the user can select multiple seats. *See, e.g.*, '361 patent at 1:13–31, 2:40–48, 3:61–62, 5:22–26, 5:42–49. The '869 patent incorporated the '361 patent's specification, '869 patent at 1:8–13, and also itself discloses selecting multiple seats. '869 patent at 4:62–66. Additionally, Figures 3A, 3B, and 4B show seats grouped as tables. Those tables have numbers, but the individual seats do not. Those tables could be construed as sets of seats. Thus, one of skill in the art would not read the patents to disclaim the selection of sets or groups of seats. Accordingly, the Court does not adopt Defendants' proposed limitations that would limit sets of seats to individual seats.

**current available seat information on one or more of the sets of available individual seats**

This term is used in claims 1 and 5 of the '869 patent. CEATS contends it does not require construction. Defendants argue it should be construed as "information related to the individual seat or seats displayed in the interactive seating map which have not yet been selected." Based on the Court's analysis above, the Court rejects Defendants' construction. Having determined that sets of available individual seats is not limited to individual seats, the term does not require further construction.

**information relating to the sets of available individual seats from which the end user can select one or more available seats**

This term is used in claims 1 and 5 of the '869 patent. CEATS maintains it does not require construction. Defendants argue it means "a plurality of icons, on the interactive seating map, each of the icons corresponding to an individual seat which has not yet been selected by a prospective customer." Defendants' arguments in support of their proposed construction are limited to why this term is limited to the individual selection of seats. For the reasons above, the Court does not so limit the term. Having resolved the parties' dispute, this term does not require construction.

**portion**

This term is used in claims 1 and 3 of the '870 patent and claims 1, 5, 6, 7, 8, 14, 15, 19, and 20 of the '728, '729, and '663 patents. The term is used in the context of placing a mouse over a portion of the interactive seating map. CEATS contends it does not need to be construed. Defendants argue it means "an individual seat" or alternatively is indefinite under 35 U.S.C. § 112 because Defendants assert only individual seats are disclosed. For the reasons already given, the Court does not limit "portion" to "an individual seat." Similarly, for the same reasons, one of skill

in the art would not find the term to be insolubly ambiguous.

**selection of the current available seat information on one or more of the sets of available individual seats, wherein the selection based on a mouse click**

This term is used in claims 1 and 5 of the '869 patent. CEATS contends it does not require construction. Defendants argue it means "selection of an individual seat or seats shown on the interactive seating map as not having previously been selected by a prospective customer by a mouse click on each individual seat." This term raises the same seat versus set issue discussed previously and the parties rely on their previously described arguments. For the same reasons, the Court does not adopt Defendants' "individual seat" limitation. Having resolved the parties' dispute, this term does not require further construction.

**selected seats**

This term is used in claims 1 and 5 of the '869 patent. CEATS contends it does not need to be construed. Defendants argue it means "the individual seat or seats selected by a prospective customer on the interactive seating map" or alternatively it is indefinite under 35 U.S.C. § 112. As previously discussed, the Court has already resolved the "individual seat" issue.

Alternatively, Defendants argue this term is indefinite because there is no antecedent basis for "selected seats." Defendants contend there is no antecedent basis for "selected seats" because the claims require "accepting over the wide area network from the end user a payment for the one or more selected seats" but do not recite any step in which a seat is selected.

It would be clear to one of skill in the art that these particular claims are written to not read on any acts by or systems of the end user. Therefore, it would make sense to one of skill in the art that the end user's act of selecting a seat is not required by the claims. The claims recite providing

a page that includes a seating map "from which the end user can select one or more available seats." '869 patent at 6:51–52 (claim 1); 7:17–18 (claim 5). One of skill in the art would, however, understand that the end user has selected a seat when the system "receiv[es] from the end user a selection of the current available seat information on one or more of the sets of available seats, wherein the selection is based on a mouse click." Thus, one of skill in the art would understand this to provide the antecedent basis for accepting payment "for the one or more selected seats." Accordingly, Defendants have not shown by clear and convincing evidence that this term is insolubly ambiguous.

As this term is not indefinite and the Court has already resolved the "individual seat or seats" issue, the term does not require construction.

**client node unaffiliated with the server**

This term is used in claim 1 of the '361 patent. CEATS contends the term means "a computer having no dedicated network connection to the server." Defendants contend the term is indefinite under 35 U.S.C. § 112.

Defendants contend the term is indefinite because the claim recites both a "device" connected to a wide area network and a "client node" that is "unaffiliated with the server." Defendants argue that different words used in the claims are presumed to have different meanings. Defendants contend it is impossible to determine from the claim language whether the client node is the device, the client node is a part of the device, the device is a part of the client node, or the client node is separate from the device. Defendants contend the term is not amenable to construction.

CEATS argues the device and client node are the same thing. CEATS contends the claim language and specification support its construction that there is no dedicated network connection

between the server and client node, rather a conventional internet connection may be used. *See* '361 patent at 7:10–23, 1:27–29, 4:52–57, 5:4–14, 5:59–63. CEATS also contends its constructions distinguishes the prior art kiosks that had dedicated network connections to the relevant servers. *See id.* at 1:59–2:2.

The patents and claims at issue in this case are generally drafted to describe the system that allows a remote end user to select and purchase a seat for a particular venue, event, or means of transportation. The specification and claims are written from the perspective of the system that is selling the tickets. The end user is described as using the internet or other wide area network to access the system. *See e.g.*, '361 patent at Abstract, Fig. 2, 1:17–21, 5:4–15, 5:59–63. The user is described as being remote and using "a computer terminal or other such device." *Id.* at 1:43–44. Accordingly, the claims are not very detailed in describing how the end user connects to the claimed system. Claim 1 requires:

> communicating [information] . . . to a device . . . ;
> transmitting the information to the device to be displayed to the end user, . . . such
> that an end user . . . can view the information on a client node unaffiliated
> with the server . . . .

Claim 1 calls for a "device" and a "client node unaffiliated with the server." Different terms within a claim are presumed to have different meanings. However, this is only a presumption and can be overcome. A skilled artisan would understand that once the user's device is connected to the server, it becomes a client node relative to the server. One of skill in the art would understand the relationship between servers and clients and would understand that the later-mentioned client node is the earlier mentioned device. Defendants have not shown by clear and convincing evidence that one of skill in the art would find this term insolubly ambiguous. The Court construes "client node

9

unaffiliated with the server" as "a computer having no dedicated network connection to the server."

**general purpose computer**

This term is used in claims 1-8 of the '866 patent; claims 1 and 5 of the '869 patent; claims 1 and 3 of the '870 patent; and claims 1, 8, and 15 of the '728, '729, and '663 patents. CEATS contends it means "a computer without dedicated resident ticket vending software." Defendants originally contended a "general purpose computer" is "a computer that is neither primarily used, nor previously configured, for ticket vending" but at the hearing agreed to "a computer without dedicated resident ticketing software." CEATS however did not agree to exclude "vending" from its proposed construction. Thus, the parties dispute whether "general purpose computer" should be construed to exclude computers with "ticketing" software (broader exclusion) or "ticket vending" software (narrower exclusion).

While the patent does not define "general purpose computer," it does instruct that the present invention can be used by anyone through his home or office computer, which presumably would not include specialized software for this purpose: "The rapid growth of the internet now makes it possible for anyone at his home or office to avail himself of the advantages of the instant invention through a simple internet or other wide area network connection." '866 patent at 1:59–62. The patent describes and distinguishes the prior art, which utilized kiosks as a means of selling tickets. "Additionally, said prior art makes extensive use of what is called 'kiosks' implying that, unlike the instant invention, it is only from his specialized machines that such services may be rendered." *Id.* at 2:3–6. Claim 1 requires a general purpose computer connected to a wide area network. Nowhere in the patent does the patent describe or allude to any specialized software preinstalled on the computer. CEATS has not shown that its narrower exclusion of "vending" software is appropriate

in light of the patent's statement that anyone can use the invention from his home or office computer. Accordingly, the Court construes "general purpose computer" as "a computer without dedicated resident ticketing software."

**additional [current available seat] information** and **additional display of information**

These terms are used in claim 1 of the '361 patent; claims 1 and 3 of the '870 patent; and claims 1, 8, 15, 19, and 20 of the '663, '728, and '729 patents. CEATS contends these terms do not require construction. Defendants contend they mean "information not otherwise visible on the webpage [about the individual seats that have not previously been taken]." The parties dispute whether hovering the mouse over a seat must cause the display of information that is not otherwise displayed on the screen (Defendants' position) or can display information that is given elsewhere on the screen (CEATS' position).

CEATS contends Defendants' proposed construction excludes a preferred embodiment shown in Figure 4. The available seats shown in Figure 4B include seats with seat numbers already displayed on the map (barstools) and seats without seat numbers already displayed (table seats). A mouse over of the barstool, for which the seat number is already displayed, causes a window 26 to display the seat number again. Therefore, the additional information displayed in response to mousing over the barstool is not new information, but information already displayed on the map.

Defendants contend that for "additional" to have meaning, this term must require displaying new, not already displayed, information. Defendants contend that CEATS's barstool example is not described in the specification. Both sides cite the same portion of the prosecution history to support their positions.

The specification discloses embodiments for seats that have numbers (bar stools) and

generally describes a mouse over causing seat numbers to be displayed in window 26. *See* '361 patent at Fig. 4B, 6:24–38. Displaying the seat number in the window is a display of additional information (new location and size). Moreover, the parties agree these terms—"additional [current available seat] information" and "additional display of information"—should be given the same construction. The term "additional display of information" makes clear that the word "additional" modifies "display" rather than "information." Thus, Defendants' construction would conflict with the explicit claim language. Accordingly, the Court rejects Defendants' construction. Having resolved the parties' claim construction dispute, this term does not require construction.

**interactive seating map**

This term is used in claims 1 and 5 of the '869 patent. CEATS contends it does not require construction. Defendants contend it means "an exact seating arrangement including a plurality of individual seats, from which an end user[2] may select an individual seat or seats."

CEATS contends this term does not require construction and is plainly understood to be a seating arrangement map that is responsive to user interaction. CEATS argues Defendants' limitation that the map be exact is improper because that is not required by the claims or specification. CEATS also contends this term raises the previously discussed sets versus seats issue because the claim requires "an interactive seating map representing information relating to the sets of available seats" and Defendants' construction requires the selection of individual seat(s). Defendants contend that, as discussed in earlier terms, the only manner of seat selection disclosed is to select individual seats. Defendants further contend that an exact seating arrangement is required

---

[2] At the hearing, Defendants agreed to substitute "end user" for "prospective customer" in their proposed construction in light of the parties' agreement on the construction of "end user."

due to two passages referencing "exact" seating. *See* '361 patent at 1:13–15, 5:63–66.

This term does not require construction. The parties' dispute with regard to sets verses seats has already been resolved. Additionally, Defendants did not point to a clear disclaimer that would require their "exact" limitation, and the Court will not so limit the term. One of the passages pointed to by Defendants uses "exact" to describe the seat the user can select, not the map itself. Further, the specification makes repeated references to the map as only being a "representation." '361 patent at Fig. 1, steps 8–11(A), 1:24–25, 5:30–33, 6:15–18. Such an interpretation that an exact map is not required is also consistent with the disclosed use for stadiums, an embodiment that seems counter to an exact map. *See* '361 patent at 2:48. A lay jury will understand and recognize what is meant by an "interactive seating map" without any construction.

**returning over the wide area network to the end user verification of the successful completion of the payment**

This term is used in claim 1 of the '361 patent and claims 1 and 8 of the '866 patent. CEATS contends it does not require construction. Defendants contend it means "responding to the end user via the wide area network upon receiving the payment with verification that payment processing completed successfully."

Defendants argue that verification and successful completion of the payment have specific meanings. Defendants contend that this language requires more than just receipt of the payment but that the payment be fully processed. At the hearing, Defendants declined to elaborate on what "processing" in their construction means. CEATS is concerned that Defendants' construction could be read to require that a third-party credit card company must actually complete processing the transfer of funds before the system can return a verification of successful payment completion.

13

As CEATS argues, Defendants' proposed construction is overly restrictive. The specification describes that once payment is verified, seats are no longer shown as available. *See* '361 patent at 6:3–24. If two users both attempt to simultaneously purchase the same seats, the user who first receives validation for his payment will actually purchase the seats while the other user will be notified that the seats have already been sold. *Id*. at 6:17–24. One of skill in the art would read the patent and understand that verifying payment does not require a third-party credit card company to actually transfer the funds that will pay for the seats. Such a strained reading as proposed by Defendants is not supported by the specification, let alone evidenced by a clear and unambiguous disclaimer. Such a reading would cause consistent problems of selling the same seats repeatedly. Instead, one of skill in the art would understand the ordinary meaning of the claims to encompass the normal process of e-commerce, namely that the verification is the successful approval of the payment submission, not that the funds have actually been transferred and cleared by third parties. Similarly, a lay jury will understand this term without formal construction since its meaning is consistent with ordinary e-commerce transactions.

**interaction being triggered**

This term is used in claims 1 and 3 of the '870 patent and claim 8 of the '663 patent. To put the term in context, claim 1 of the '870 patent requires "the graphical user interface providing additional current available seat information . . . in response to a user interaction . . . the user interaction being triggered when placing a mouse over at least a portion of the interactive seating map." CEATS argues it does not need to be construed and the claim language clearly recites a mouse over triggering a response. Defendants contend it is indefinite under 35 U.S.C. § 112.

Defendants argue the term is indefinite because the claims require the "user 'interaction' be

'triggered when/by placing a mouse over at least a portion of the interactive seating map." Docket No. 602 at 28. Defendants contend this is nonsensical because "placing a mouse over" cannot trigger a "user's interaction." In other words, Defendants read the claims to require "that the 'user interaction' itself is triggered by the movement of the mouse pointer." *Id.* at 29.

One of skill in the art would not find this claim language insolubly ambiguous. The claims and specification are clear: the user interacts with the interactive map by moving the cursor or map over various seats, when the mouse is over a seat additional information is displayed, and the user may select that seat or move on to another seat. Defendants misread the claim language to require the user's actions be triggered: "'placing a mouse over' the seating map does not trigger or cause the end user to do anything." *Id.* 602. One of skill in the art would not read the claim language to require a mouse over to trigger a user to act. Rather, the claim language describes that additional information is displayed in response to "a user interaction," and that interaction is caused by mousing over a portion of the seating map. Defendants would read the claims to require additional information displayed in response to a *user's action*, that action triggered by a mouse over. One of skill in the art would understand that "a user interaction" is mousing over a seat map and the display of additional information is in response thereto.

As Defendants have not shown by clear and convincing evidence that the term is insolubly ambiguous and there are not other claim scope disputes as to this term, this term does not require construction.

**Order of Method Steps**

"[A]lthough a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the

15

claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). However, "[t]he specification or prosecution history may also require a narrower, order-specific construction of a method claim in some cases." *Id*.

Defendants argue the claims of the '728 patent, '729 patent, and '663 patent are written to require that the first step is "[r]eceiving over the network from a general purpose computer first data representing payment information," as this step is written first and explicitly labels the payment information as "first," and the second and third steps correspond to the second and third data, respectively. CEATS argues theses steps are not required to be performed in the order they are listed.

The steps in the '728, '729, and '663 patents' method claims are not written to explicitly or implicitly require a specific order. The "first" and "second" labels used in the claims do not describe the steps themselves. For example, the patents are not written as "a method comprising: first, receiving . . . ; second, transmitting . . . ." Instead the uses of "first" and "second" modify "data" as used in the claims. This is a common patent-drafting practice to distinguish the data in the receiving step from the data in the transmitting step. It does not, implicitly or explicitly, require that the steps be performed in a particular order. Accordingly, the Court denies Defendants' request to find that the first step must be performed first.

At the hearing, Defendants argued that based on logic the remaining steps must also be performed in the order they are listed. Defendants did not make this argument in their briefs, and the issue was not briefed before the claim construction hearing. Accordingly, the Court's holding is limited to the arguments the parties briefed, and the Court does not opine on whether the additional steps must be performed in a particular order.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix A.

**So ORDERED and SIGNED this 21st day of July, 2011.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

**APPENDIX A**

| Claim Term | Court's Construction |
|---|---|
| client node unaffiliated with the server ('361 patent, claim 1) | a computer having no dedicated network connection to the server |
| dedicated resident ticket vending software ('361 patent, claim 1) | software designed for ticket vending that remains installed on a computer |
| general purpose computer ('866 patent, claims 1-8; '869 patent, claims 1, 5; '870 patent, claims 1, 3; '728/'729/'663 patent, claims 1, 8, 15) | a computer without dedicated resident ticketing software |
| accepting over the wide area network from the end user a payment for a seat ('361 patent, claim 1)<br><br>accept over the wide area network from the end user a payment for the seat ('866 patent, claims 1 and 8)<br><br>accept over the wide area network from the end user payment information for the one or more selected seats ('870 patent, claims 1 and 3) | no construction |
| additional [current available seat] information additional display of information ('361 patent, claim 1; '870 patent, claims 1, 3; '663/'728/'729 patent, claims 1, 8, 15, 19, 20) | no construction |
| current available seat information on one or more of the sets of available individual seats ('869 patent, claims 1, 5) | no construction |
| end user ('869 patent, claims 1, 5) | no construction |
| information relating to the sets of available individual seats from which the end user can select one or more available seats ('869 patent, claims 1, 5) | no construction |
| interactive seating map ('869 patent, claims 1, 5) | no construction |
| list of selected seats ('361 patent, claim 1; '866 patent, claims 1, 8) | no construction |

| | |
|---|---|
| portion<br>('870 patent, claims 1, 3; '728 /729/'663 patent, claims 1, 5, 6, 7, 8, 14, 15, 19, 20) | no construction |
| returning over the wide area network to the end user verification of the successful completion of the payment<br>('361 patent, claim 1; '866 patent, claims 1, 8) | no construction |
| selected seats<br>('869 patent, claims 1, 5) | no construction |
| selection of the current available seat information on one or more of the sets of available individual seats, wherein the selection is based on a mouse click<br>('869 patent, claims 1, 5) | no construction |
| venue<br>('361 patent, claim 1; '866 patent, claims 1, 2, 3, 4, 8; '869 patent, claims 1, 2, 3, 5) | no construction |
| interaction being triggered<br>('870 patent, claims 1, 3; '663 patent, claim 8) | no construction |